**Charlotte Ann EDWARDS, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–16896.**

Court of Criminal Appeals of Oklahoma.

Oct. 26, 1971.

Don Anderson, Public Defender, for plaintiff in error.

Larry Derryberry, Atty. Gen., for defendant in error.

BUSSEY, Presiding Judge.

Charlotte Ann Edwards, hereinafter referred to as defendant, was charged in the District Court of Oklahoma County, Oklahoma with the offense of Murder; she was convicted of the offense of Manslaughter in the First Degree. Her punishment was fixed at thirty (30) years imprisonment and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Billie Jean Jackson testified that she had known the defendant for approximately eight years, and that they were very good friends. Billie Jean testified that she had been going with one Willis Edward Griffin, about three days prior to December 28, 1970. Griffin was at her home when she left on the evening of December 28, 1970. Billie Jackson returned to her home at approximately 4:30 a. m., after spending the evening drinking, and observed an ambulance parked in front of her home. Billie Jean Jackson testified that Willis Griffin had permission to be in her home, but that the defendant did not have permission to be in her home unless she was present.

Finnis Williams testified that the defendant was living with him. In fact, in the early morning hours on December 29, 1970, the defendant asked him to take her to Billie Jean Jackson's residence. Upon arriving at Billie Jean Jackson's house, the defendant tried to get into the front door and was unsuccessful, but she went around to the back door and got in. The defendant came through the house, opened the front door, and called to Williams to come into the house. The defendant went next door to see if Billie Jean was there and remained approximately thirty minutes. She returned to Billie Jean's house with Willis Edward Griffin. The defendant talked for a short period of time, and she ordered

Griffin to leave the house. Griffin left and came right back in, wherein the defendant grabbed two knives from the table and stabbed Griffin in the chest. The defendant stabbed him approximately six or seven times in the back as he fell to the floor. The defendant then picked up a hammer and started to hit Griffin, wherein Williams told her to put the hammer down. Williams testified that Griffin did not make any threats toward the defendant that evening nor did he make any aggressive moves toward the defendant prior to the stabbing.

Officer Taylor testified that he arrived at the scene approximately 4:15 a. m., and observed the defendant sitting at the head of a male subject, who was later identified as Willis Griffin. Griffin was lying on his stomach and had numerous stab wounds in the back. There was a blade, part of a knife, still in the victim's back. A claw hammer was laying on the floor pretty close to where Griffin was lying. He advised the defendant of her rights against self-incrimination, wherein he stated she had killed Griffin.

Detective Jerry Guinn testified that he investigated the scene of the homicide, and subsequently interviewed the defendant at the police department. After advising the defendant of her Miranda rights, the defendant executed a written rights waiver, which was introduced into evidence. A typed statement was subsequently taken from the defendant when she signed.

The defendant stated that she had gone to Billie Jean's house with Finnis Williams and smelled something burning. She was unable to get in the front door, so she went to the back door and broke in, taking a pot of burning beans from the stove. The defendant went next door to see if Billie Jean was visiting a neighbor and discovered that Willis Griffin was at the residence. Griffin followed her back to Billie Jean's house, and she told him to get out. Griffin started to come back into the house, wherein she told him, "Didn't I tell you not to come in here" and then stabbed him with two knives. The defendant did not know how many times she stabbed him. After he fell to the floor, she picked up a hammer and put it down after Williams told her to stop. In response to why she killed Griffin, she stated, "I can tell you that Willis had been going with my cousin, my sister, and my cousin, and me, then my best friend. I had a baby they—correction—that almost killed me. He told me he did not need me any more after it happened. Billie told me that he was her man and I told her he had me first and she said I'm lying." (Tr. 59)

Officer Knox testified that he took certain photographs that pertained to physical evidence at the scene.

Dr. Marshall testified that he was called to the scene and observed the victim with multiple stab wounds.

Dr. Pless testified that he performed an autopsy on the body of Willis Edward Griffin. In his opinion the cause of death was the stab wound in the right chest and heart. There were an additional five stab wounds in the back which were inflicted after the victim had already died.

The defendant testified that she had gone with Willis Edward Griffin approximately two years prior to the day in question. The defendant and her boyfriend, Finnis, went to Billie Jean Jackson's house to discuss renting an apartment next door. Upon arriving, she smelled something burning within the house and broke into the back door to put out the fire. The defendant called Finnis into the house, and she went next door to see if Billie Jean was there. She stayed there for approximately thirty minutes and returned to Billie Jean's house. Griffin tried to follow her into the house, and she pushed him and told him to leave, because Billie Jean wasn't at home. Griffin, subsequently, opened the door, came in and pushed her back against the bed. Griffin started toward her, she grabbed a knife and hit at him. The defendant was afraid of Griffin,

because he had previously beaten her while they were going together. She did not intend to kill him and did not know how many times she stabbed him. The defendant testified that she did not read the statement testified to by the police officer, prior to signing it. The defendant admitted being convicted of two prior felonies.

■ The first proposition asserts that the verdict is not supported by the evidence. We have consistently held that where there is competent evidence in the Record from which the jury could reasonably conclude that the defendant was guilty as charged, the Court of Criminal Appeals will not interfere with the verdict, even though there is sharp conflict in the evidence, and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and to determine the facts. Jones v. State, Okl.Cr., 468 P.2d 805 (1970).

■ The final proposition contends that the punishment is excessive. Question of excessiveness of punishment must be determined by a study of all the facts and circumstances in this particular case. We have previously held that the Court of Criminal Appeals does not have the power to modify sentence, unless we can conscientiously say that under all facts and circumstances the sentence is so excessive as to shock the conscience of the Court. Ransom v. State, Okl.Cr., 453 P.2d 301. From the foregoing statement of facts, we cannot conscientiously say that the sentence of thirty (30) years shocks the conscience of this Court, in that the evidence would have been sufficient to support a conviction of the offense of Murder.

In conclusion, we observe that the Record is free of any error which would require reversal or justify modification, and under said circumstances, we are of the opinion that the judgment and sentence should be, and the same is, hereby affirmed.

NIX and BRETT, JJ., concur.